STATE of Missouri, Respondent,

v.

Jackie JOHNSON, Appellant.

No. 66921.

Supreme Court of Missouri,
En Banc.

Nov. 21, 1985.

Rehearing Denied Dec. 17, 1985.

of exclusion of the blind was not developed and there is no foundation for asserting constitu-    tional error.

Sean D. O'Brien, James W. Fletcher, Kansas City, for appellant.

John Ashcroft, Atty. Gen., Duane Butler, Asst. Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

BILLINGS, Judge.

Defendant Jackie Johnson was tried by a jury and convicted of manslaughter in the Circuit Court of Jackson County.[1] Defendant seeks reversal because he was not permitted to offer extrinsic evidence that prosecution witness Phillip Street was hostile toward and racially prejudiced against him.

The Missouri Court of Appeals, Western District, rejected defendant's contention that his Sixth Amendment right of confrontation had been violated and affirmed the judgment. We granted transfer of the cause because of its general interest and importance. Rule 83.03. We affirm.

During the evening hours of June 11, 1982, approximately forty young people gathered in a park located in southeast Kansas City for a beer party. This group was predominately, if not exclusively, white. Defendant, who is black, entered the park with his eight year old son; and thereafter, met five or six other black males near some picnic tables. At some point during the evening defendant exchanged harsh words with one or more of the white males who were there for the party. The origin and nature of this trouble was vigorously disputed at trial. The state's theory was that defendant, without sufficient provocation, shot and killed John Watson and seriously wounded Phillip Street, both white—after an exchange of abusive words with John Watson.

Defendant's theory of the case was built around self-defense. The defendant attempted to show that the group of whites, after learning of the defeat of Gerry Cooney to Larry Holmes for the heavyweight

1. Though defendant was convicted of manslaughter, he was charged with second degree murder under § 565.004, RSMo 1978 and assault in the first degree under § 565.050, RSMo 1978. The latter charge was voluntarily dismissed by the state before submission to the jury.

championship title, became openly abusive and threatening to defendant and to other blacks present in the park. According to defendant's evidence, a group of white males armed with sticks, clubs, nunchaks and one gun advanced on defendant and his son. Defendant testified that a number of whites began to attack and he fired at them in self-defense. Watson was killed with one shot and Street was seriously wounded by another round.

The pivotal question is whether the decision of the trial court not to allow defendant to use extrinsic evidence to further demonstrate to the jury Street's prejudice and hostility toward defendant amounted to a violation of defendant's right of confrontation under the Sixth Amendment. Based on our review of the 489 pages of trial transcript and on our understanding of Sixth Amendment jurisprudence, we are unable to conclude that the action complained of constituted a violation of defendant's Sixth Amendment right of confrontation.

■ It is well-established that an important purpose of the constitutionally protected right of cross-examination is to provide litigants with a meaningful opportunity to challenge the veracity of testimony through the process of impeachment. *State v. Russell,* 625 S.W.2d 138 (Mo. banc 1981); *see also* McCormick On Evidence, § 22 (3rd ed. 1984). If a witness is hostile, biased or prejudiced against a party, the substance of his testimony may be affected by his other than impartial state of mind. *See State v. Ofield,* 635 S.W.2d 73, 75 (Mo.App.1982). In such an instance, that party should be afforded an opportunity to display before an uninformed jury the bias, hostility, or prejudices held by the witness against that party. Once informed, the jury can then, with greater accuracy, determine the appropriate weight to be given the whole of the witness' testimony.

■ Under Missouri law, "the interest or bias of a witness and his relation to or feeling toward a party are never irrelevant matters...." *State v. Edwards,* 637 S.W.2d 27 (Mo.1982). Furthermore, a par-

ty is not confined to the answers elicited on cross-examination and may prove the witness' bias, prejudice or hostility through the use of extrinsic evidence. *State v. Solven,* 371 S.W.2d 328 (Mo. banc 1963). Notwithstanding these established evidentiary principles, the authority of a party, and in particular a criminal defendant, to show the existence and extent of a witness' bias, prejudice or hostility is subject to the sound discretion of the trial court. *State v. Edwards,* 637 S.W.2d at 30. *See also State v. Pigques,* 310 S.W.2d 942 (Mo.1958); *State v. McLachlon,* 283 S.W.2d 487 (Mo.1950).

Defendant contends that the trial court's refusal to allow him to demonstrate Street's hostility and prejudice through the impeachment testimony of two witnesses was violative of his right of confrontation. The constitutional character of a criminal defendant's right to impeach a witness for the particular purpose of revealing the witness' bias and prejudice was considered by the United States Supreme Court in *Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

In *Davis,* a state trial court restricted too severely the defendant's cross-examination of a prosecution witness concerning the fact that at the time the witness identified defendant, the witness himself was on probation by order of a juvenile court—after having been determined delinquent for burglary. *United States v. Davis, supra,* at 311, 94 S.Ct. at 1108. The defendant in *Davis* wanted to question the witness about his probation, to show a possible motive for testifying against defendant. *Id.*

In analyzing the constitutional character of a criminal defendant's right to show the bias or prejudice of a witness, the Court in *Davis* made clear that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *Id.* at 316, 94 S.Ct. at 1110. However, prior to reaching this conclusion, the Court did note that the breadth and depth of cross-examination is subject to the broad discretion of the trial court. *Id. See generally,*

*Smith v. Illinois,* 390 U.S. 129, 132, 88 S.Ct. 748, 750, 19 L.Ed.2d 956 (1968); *Alford v. United States,* 282 U.S. 687, 694, 51 S.Ct. 218, 220, 75 L.Ed. 624 (1931).

There are sound reasons for having a rule which gives a trial court the discretionary authority to limit the scope of cross-examination directed toward impeachment. As the helmsman of the trial process, a trial judge should be able to keep the process from becoming weighted down with the accumulation of cumulative evidence and free of undue harassment of witnesses. It should be within the power of the trial court to limit or exclude the use of impeachment evidence whose prejudicial effect far out-distances its value to the jury as an aid for determining credibility. As Professor McCormick has noted, a trial judge "has the responsibility for seeing that the sideshow does not take over the circus." McCormick On Evidence, § 41 (3rd ed. 1984). In *Davis,* the exercise of the trial court's discretion proved too restrictive, and consequently ran afoul of the constitution. In the present case, however, the facts detailing the course of the trial, which are contained in the transcript, belie defendant's claim of a Sixth Amendment violation.

Immediately before defendant presented his case in chief, the state moved for a motion in limine preventing defendant from offering any evidence which would impeach Street for hostility and prejudice. Defendant then made an offer of proof in narrative form showing what the testimony of his two proposed witnesses would reveal if they were to testify. First, defense counsel indicated that defendant's wife, Judy McCrary, would testify that on June 24, 1982, she saw Street back his truck into defendant's garage. Second, she would testify that during that same evening shots were fired into defendant's house and a burning cross placed in the front yard. The person or persons responsible for these two acts were not known to her. Finally, defense counsel stated that a jail guard present at a pretrial hearing held on November 16, 1982, would testify that he heard Street make a death threat to defendant.

It is clear that this proffered evidence would have given the jury insight into Street's hostility toward defendant—assuming he was responsible in some way for all of the acts described. However, it should first be noted that the trial court gave defendant a relatively broad license on cross-examination to inquire into these incidents and Street's alleged involvement. The trial court, however, chose not to permit defendant to use extrinsic evidence to impeach Street, who denied any and all involvement.

■ Because defendant was given an opportunity to cross-examine Street, though not to the fullest extent possible nor by the most effective means available under Missouri law, the critical question to be asked is " 'whether the jury was otherwise in possession of sufficient information concerning formative events to make a "discriminating appraisal" of [Street's] motives and bias.' " *United States v. Touchstone,* 726 F.2d 1116, 1123 (6th Cir.1984) citing *United States v. Campell,* 426 F.2d 547, 550 (2nd Cir.1970); *see also, United States v. De Gudino,* 722 F.2d 1351 (7th Cir.1983); *Jackson v. State,* 695 P.2d 227 (Alaska App.1985).

■ It is apparent from just the cold dispassionate transcript that a reasonable jury could not have been anything but very much aware of Street's antipathy for defendant. On direct examination, Street testified that he saw his friend, John Watson, shot and killed by defendant without sufficient provocation. According to Street, defendant then fired at him after he attempted to retaliate against defendant seconds after Watson was shot. Defense counsel effectively cross-examined Street to highlight his role in the sequence of events. The transcript clearly reveals that Street harbored the natural hostility any victim might have against his attacker. There can be no doubt but that the jury had abundant opportunity to gather information sufficient to allow them to make a

discriminating appraisal of Street's hostility toward defendant.

In addition to wanting to reveal Street's hostility as a victim, defendant wanted to show that he was also racially prejudiced against defendant. First, it cannot be overlooked that Judy McCrary's testimony concerning the burning cross would not have included identification of the person or persons responsible for that deplorable act. Second, it is obvious that this entire unfortunate controversy is wrought with racial animosity. And defendant's cross-examination of Street, along with his cross-examination of the other six eyewitnesses brought this reality squarely and forcefully to the attention of the jury. Street's credibility was more than adequately called into question, and the jury was supplied with ample information concerning his alleged racial prejudices, so as to allow them to make a discriminating appraisal of the veracity and integrity of his testimony. Consequently, we find no constitutional infirmity in the trial court's exercise of discretion not to allow defendant to impeach Street for hostility and prejudice by way of extrinsic evidence.

■ Defendant's second point on appeal concerns the following question posed to defendant on cross-examination by the prosecution.

Q. Right. Now as far as you being a member of this homeowner's association, you were renting that home at the time from Mr. John Mondaine, were you not?

Defendant objected to the prosecution's reference to Mr. John Mondaine, who defendant alleges is a widely known criminal, and to the prosecution's attempt to prejudice defendant by connecting him to Mr. Mondaine. The trial court, though unfamiliar with Mr. Mondaine, sustained the objection and offered to give a curative instruction. However, defendant refused to accept such an instruction and insisted upon a mistrial. A mistrial was not declared.

■ It is conceded by defendant that "there is no indication that [the] jurors were aware of Mr. Mondaine's criminal rep-utation." Defendant's Brief at 16. In this connection, defendant has failed to demonstrate any prejudice resulting from the single reference to Mr. Mondaine. The trial court was in a superior position to observe and judge the effect of the complained of question. Based on its observations, the trial court chose not to exercise its discretion in favor of defendant's motion for a mistrial. As we have noted before, declaring a mistrial is a drastic remedy warranted only by the most compelling of circumstances. Here, the record fully supports the trial court's conclusion that the circumstances did not warrant such a drastic remedy.

Judgment affirmed.

HIGGINS, C.J., BLACKMAR, DONNELLY and WELLIVER, JJ., and CROW and FLANIGAN, Special Judges, concur.

ROBERTSON and RENDLEN, JJ., not sitting.